IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,          )
                                   )
                                   )
            Plaintiff,             )
                                   )
vs.                                )  CASE NO. M-24-760-SM
                                   )
                                   )
NASIR AHMAD TAWHEDI,               )
                                   )
                                   )
                                   )
            Defendant.             )
                                   )


TRANSCRIPT OF PRELIMINARY/DETENTION HEARING

BEFORE THE HONORABLE SUZANNE MITCHELL

UNITED STATES MAGISTRATE JUDGE

OCTOBER 17, 2024; 9:00 A.M.

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

APPEARANCES

FOR THE GOVERNMENT:

    Mr. Matthew B. Dillon
    Mr. Mark R. Stoneman
    Ms. Jessica L. Perry
    Assistant United States Attorneys
    U.S. Attorney's Office
    210 West Park Avenue, Suite 400
    Oklahoma City, Oklahoma 73102


FOR THE DEFENDANT:

    Mr. Craig M. Hoehns
    Hoehns Law Office
    5600 North May Avenue, Suite 310
    Oklahoma City, Oklahoma 73112

1                              **INDEX**

2                                                        PAGE

3

DEREK WILEY
4        Direct Examination By Mr. Dillon................  6
         Cross-Examination By Mr. Hoehns................. 10

5

6

7    Reporter's Certificate............................ 40

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings had on October 17, 2024.)

2              THE COURT:  Good morning.  I am Judge Suzanne

3   Mitchell.

4          We are here for M-24-760, United States vs. Tawhedi.  We

5   are here for a preliminary hearing, to be followed potentially

6   by a hearing on the United States' motion for pretrial

7   detention.

8          I will ask counsel to make their appearances.

9              MR. DILLON:  Matt Dillon, Jessica Perry, and Mark

10  Stoneman on behalf of the United States.  Also at counsel table

11  with us is FBI Special Agent Derek Wiley.

12             MR. HOEHNS:  Craig Hoehns for the defense.

13             THE COURT:  Thank you.

14         And I would like to just confirm that we have Mr. Samadey,

15  who has been appointed to serve as an interpreter, and that he

16  is on the Tips line, which is our interpretation tool,

17  simultaneously interpreting.

18         However, if at any point in time, Mr. Samadey or

19  Mr. Tawhedi, if there is an issue that you cannot hear or you

20  do not understand something, please let Mr. Hoehns know.

21         And, Mr. Hoehns, please don't hesitate to let the Court

22  know so that we can make sure everything has been understood

23  and that we are all on the same page.

24         So I'll ask if the United States would like to present any

25  evidence in support of the preliminary hearing?

1    And I'll also ask, if there is any overlap, is there any

2  objection to proceeding both as to detention and as to

3  preliminary hearing, Mr. Hoehns?

4          MR. HOEHNS:  No objection, Your Honor.

5          THE COURT:  Thank you.

6    Mr. Dillon, if you are so prepared.

7          MR. DILLON:  Yes, Your Honor.

8    Before we begin, I wanted to address an email that we sent

9  to the Court and to counsel last week as it relates to the

10  probable cause affidavit.

11    Specifically, Paragraph 9, the Department of Homeland

12  Security advises that, in their words, Nasir Ahmad Tawhedi was

13  partially paroled into the United States and currently has a

14  pending application for lawful permanent resident status based

15  upon an approved petition for Afghan Special Immigrant Visa

16  applicants.

17    I would further add that the defendant was served notice

18  yesterday by a special agent from ICE, through his attorney,

19  that his parole has now been revoked.

20          THE COURT:  Would you be able to just articulate

21  what that term "parole" means?

22          MR. DILLON:  Not with a lot of confidence, Your

23  Honor.

24          THE COURT:  But to the extent that you understand.

25          MR. DILLON:  Yes.  It is he was allowed to

1  temporarily come into the United States without a status, is my

2  understanding.  I'm sure that Department of Homeland Security

3  can speak clearer to that particular issue, but it is my

4  understanding now that his parole has been revoked, that, were

5  he to be released today, he would be unlawfully in the United

6  States.

7            THE COURT:  And there is a detainer in place; is

8  that correct?

9            MR. DILLON:  There is, Your Honor.

10            THE COURT:  Thank you.

11      You may proceed.

12            MR. DILLON:  The government calls Derek Wiley.

13            THE COURT:  Agent Wiley, if you would come up and

14  be sworn in, please.

15      (WITNESS SWORN.)

16                        DEREK WILEY

17                    DIRECT EXAMINATION

18  BY MR. DILLON:

19  Q.    Will you state your name?

20  A.    Special Agent Derek Wiley.

21  Q.    How are you employed?

22  A.    I'm a special agent with the FBI of Oklahoma City field

23  office.

24  Q.    How long have you been with FBI?

25  A.    I have been with the FBI almost nine years.

DEREK WILEY - Direct by Mr. Dillon

1  Q.   What do you do currently for FBI?

2  A.   I'm a special agent assigned to the Joint Terrorism Task

3  Force.

4  Q.   Prior to joining the Oklahoma City JTTF, did you have

5  other experience in counterterrorism matters?

6  A.   I did.

7  Q.   And what was that?

8  A.   It was at the FBI's Washington field office, or at the

9  counterintelligence and counterterrorism.

10 Q.   Are you one of the case agents on the case against Nasi

11 Ahmad Tawhedi?

12 A.   I am.

13 Q.   Have you had an opportunity to review the affidavit in

14 support of the application for criminal complaint by Agent

15 Wilkins in this matter?

16 A.   I have.

17 Q.   Other than the announcement you just heard me make to the

18 Court concerning Paragraph 9, are there any additions or

19 corrections that you are aware of that need to be made to that

20 affidavit?

21 A.   No, there are not.

22 Q.   Are you asking the Court to adopt that affidavit as part

23 of your testimony here today?

24 A.   I am.

25 Q.   Have you also, prior to your testimony here, had an

1  opportunity to speak with other agents or law enforcement

2  members concerning this case?

3  *A.*  Yes, I have.

4  *Q.*  Have you also conducted interviews, reviewed recordings

5  and other reports in this matter?

6  *A.*  Yes, I have.

7  *Q.*  Are you relying, at least in part, on all of that

8  information as part of your testimony here today?

9  *A.*  I am.

10 *Q.*  The day of the arrest of Mr. Tawhedi, did you conduct an

11 interview of Mr. Tawhedi?

12 *A.*  I did.

13 *Q.*  Do you see that person in the courtroom today?

14 *A.*  I do.

15 *Q.*  Can you describe where he's seated and what he is wearing?

16 *A.*  He is seated over your left shoulder with a gray T-shirt.

17 *Q.*  Generally the affidavit discusses a conspiracy to commit a

18 terrorist attack on Election Day; is that correct?

19 *A.*  That's correct.

20 *Q.*  It is my understanding, from the affidavit, that part of

21 that plan entailed purchasing two AK-47s and 500 rounds of

22 ammunition.

23 *A.*  That's correct.

24 *Q.*  And these acts were to be done at the behest of ISIS, as

25 alleged in the complaint?

1   A.   Yes.

2   Q.   Additionally, the second count of the complaint shows that

3   the weapons were to be used in a terrorist act or another

4   felony; is that correct?

5   A.   That is correct.

6   Q.   Did you speak with the defendant about these allegations?

7   A.   I did.

8   Q.   Had he been Mirandized?

9   A.   He had.

10  Q.   Was an interpreter present?

11  A.   There was an interpreter present.

12  Q.   Was the interpreter used to conduct this interview?

13  A.   Yes.

14  Q.   Generally, did the defendant admit to the allegations?

15  A.   He did.

16  Q.   Did he say who he believed he was speaking with in online

17  communications about the formulation of this plan?

18  A.   Yes, he did.

19  Q.   And who was that person a representative of?

20  A.   ISIS.

21  Q.   Did he confirm that there was to be an attack?

22  A.   He did confirm that.

23  Q.   Okay.  Subsequent to the defendant's arrest, are you aware

24  of three individuals later that evening, or into the next day,

25  being arrested in France?

1    *A.*    I am aware of that.

2    *Q.*    What was that arrest basis?

3    *A.*    There was an arrest in France, three individuals that

4    were -- were related to terrorism charges, potentially

5    conducting a terrorist attack in France.

6    *Q.*    Do you know if any of those three individuals are related

7    or somehow connected to this defendant?

8    *A.*    I know that two of them are his brothers.

9    *Q.*    When you say "brothers," do you mean biological brothers?

10   *A.*    Biological, yes.

11   *Q.*    Additionally, you heard my announcement prior to the

12   beginning of the hearing, but it is -- is it your

13   understanding -- or let me strike that.

14       What is your understanding as to the defendant's current

15   parole status by the Department of Homeland Security?

16   *A.*    I was just made aware yesterday that the parole status was

17   revoked.

18            MR. DILLON:  Pass the witness.

19            THE COURT:  Thank you.

20       Mr. Hoehns, when you are ready.

21                    CROSS-EXAMINATION

22   BY MR. HOEHNS:

23   *Q.*    Had the investigation on this been going on for some time?

24   *A.*    About -- before the arrest?

25   *Q.*    Before the arrest.

DEREK WILEY - Cross by Mr. Hoehns

1   A.    About 40 -- 40 to 45 days.

2   Q.    And what brought your attention to Mr. Tawhedi?

3              MR. DILLON:  Objection; relevance.

4              THE COURT:  Mr. Hoehns?

5              MR. HOEHNS:  Withdraw, Your Honor.

6              THE COURT:  Thank you.

7   Q.    (BY MR. HOEHNS)  So he had been under observation for

8   approximately 45 days?

9   A.    40, 45, yes, sir.

10  Q.    Okay.  And during that 45 days, how many times did law

11  enforcement come in contact with Mr. Tawhedi?

12  A.    Law enforcement came in contact with him approximately two

13  to three times.

14  Q.    Okay.  And the government was using a confidential source?

15  A.    They were.

16  Q.    And that's outlined in the criminal complaint affidavit?

17  A.    Yes, sir.

18  Q.    Were any of the interactions between the confidential

19  source and Mr. Tawhedi recorded?

20  A.    They were.

21  Q.    Would that have been every interaction?

22  A.    Every interaction, yes.

23  Q.    Would that have been audio or video?

24  A.    I think it's a combination of both.

25  Q.    Do you speak any languages other than English?

1   A.   I don't.

2   Q.   So you're relying on other individuals' interpretation and

3   translation of audio, video recordings?

4   A.   Correct.  Those recordings that are in a different

5   language, I am.

6   Q.   And are you, likewise, relying on other individuals for

7   written documentation?

8   A.   For translations, yes.

9   Q.   Mr. Tawhedi was arrested on October 7th?

10  A.   That's correct.

11  Q.   About what time was he arrested?

12  A.   I believe it was around 9:30 in the morning.

13  Q.   You indicated he was subsequently interviewed?

14  A.   He was.

15  Q.   What time was he interviewed?

16  A.   I believe the interview started around 10:30, 10:45 time

17  frame.

18  Q.   And what was the duration of the interview?

19  A.   That was approximately five to six hours.

20  Q.   Were there any breaks in the interview?

21  A.   There was one break where we provided Mr. Tawhedi some

22  food.

23  Q.   Where was this interview conducted at?

24  A.   It was conducted at our field office in Oklahoma City.

25  Q.   How many officers were present during the interview?

1   A.    It was just myself and an intelligence analyst, and then

2   the interpreter.

3   Q.    And was this interview recorded?

4   A.    It was.

5   Q.    Was it recorded by video, audio, or both?

6   A.    Both.

7   Q.    Were any weapons present during the interview?

8   A.    I did have my sidearm on me.

9   Q.    And that was in the interview room?

10  A.    Yes, sir.

11  Q.    Did anybody else have a weapon on them?

12  A.    No, sir.

13  Q.    How big is the interview room?

14  A.    So just an estimation, probably about 16 by 12.

15  Q.    You said there was one break?

16  A.    Yes, sir.  We -- there was one break for food, but we did

17  allow Mr. Tawhedi to use the restroom when he needed.

18  Q.    Okay.  Was Mr. Tawhedi interviewed on the way to the field

19  office?

20  A.    He was not.

21  Q.    Anybody ask him any questions whatsoever on the way to the

22  field office?

23  A.    No, sir.

24  Q.    Was his transport to the field office recorded?

25  A.    Yes, sir.

1   Q.   Was that by audio or video?

2   A.   That would be by audio.

3   Q.   Was the confidential source being used, did they speak any

4   language outside of English?

5   A.   No, sir.

6   Q.   Mr. Tawhedi doesn't speak much English, does he?

7   A.   No, sir.

8   Q.   In the complaint it indicates Mr. Tawhedi had placed an

9   order for AK-47s; is that correct?

10  A.   Yes, sir.

11  Q.   Was it Mr. Tawhedi or his brother-in-law that actually

12  made that request?

13  A.   I believe it was his brother-in-law via text message.  His

14  brother-in-law would interpret for him during these

15  interactions with CHS.

16  Q.   Do the audio recordings from the confidential source

17  actually pick up Mr. Tawhedi specifically asking his

18  brother-in-law to ask these things?

19  A.   Yes.

20  Q.   Who is Malik, or Malik?

21  A.   Abdul Malik, is that who you're referencing?

22  Q.   Yes.

23  A.   Abdul Malik is an online Telegram moniker associated with

24  ISIS.

25  Q.   Do you know definitively that that person's affiliated

 1  with ISIS?

 2  A.   Yes.

 3  Q.   You have reviewed Mr. Tawhedi's phone?

 4  A.   I have not personally reviewed it since October 7th.

 5  Q.   Has somebody?

 6  A.   Yes, sir.  It's ongoing.

 7  Q.   Is it your understanding that ISIS was ordering

 8  Mr. Tawhedi to do something, or he was doing it of his own

 9  choice?

10  A.   It was my understanding he was not being ordered, but

11  being told to do something.

12  Q.   When you say "being told," you say it's not a -- an order.

13  Can you elaborate on that a little bit?

14  A.   Well, I would say that Abdul Malik, in the conversations

15  that I have reviewed does not say I order you to do something,

16  but Mr. Tawhedi does respond that he will obey whatever he is

17  ordered to do.

18  Q.   Does it appear from the messaging that Mr. Tawhedi and his

19  brother-in-law are acting of their own accord?

20  A.   I would say they're acting on behalf of ISIS.

21  Q.   But they're not being told specifically what to do by

22  ISIS?

23  A.   They are in certain -- certain regards.

24  Q.   Okay.  Could you elaborate on that?

25  A.   Yeah.  They were being told to -- to stay here, practice

1   weapons training, and then conduct an attack here.

2   *Q.*   Okay.  And that's in Signal or elsewhere?

3   *A.*   That will be in Telegram, and during the interview with

4   Mr. Tawhedi.

5   *Q.*   At some point in time Mr. Tawhedi was invited by the

6   confidential source and government to go shoot weaponry; is

7   that correct?

8   *A.*   That's correct.

9   *Q.*   And at that point in time the government provided

10  Mr. Tawhedi a weapon to shoot; correct?

11  *A.*   That's correct.

12  *Q.*   Prior to that time, the government's unaware of any time

13  in the United States of Mr. Tawhedi having a -- a weapon; is

14  that correct?

15  *A.*   That's correct.

16  *Q.*   And after the government had invited Mr. Tawhedi to go

17  shooting, the government is unaware of Mr. Tawhedi having any

18  firearms prior to October 7th; is that correct?

19  *A.*   We are unaware of that, yes.

20       We saw that he attempted -- or was doing research on -- on

21  weapons via his Google search returns.  But to answer your

22  question, yeah, that's correct.

23  *Q.*   Okay.  That Google search return is from 2022, is it not?

24  *A.*   No.  The most recent Google search return was from this

25  year.  We also know that Mr. Tawhedi and his co-conspirator had

1  reached out to a local firearms dealer.

2  Q.   Okay.  The affidavit indicates that it would have been a

3  co-conspirator, not Mr. Tawhedi; right?

4  A.   Correct.  The number being used belonged to his

5  co-conspirator, I believe.

6  Q.   Going back to the actual question, Mr. Tawhedi, outside of

7  firearms that were placed in his hands by the government, never

8  actually possessed any firearms; correct?

9  A.   Not to our knowledge.

10  Q.   To your knowledge, has Mr. Tawhedi been accused, outside

11  of this, for anything even as minor as a traffic ticket since

12  he's been in the United States?

13  A.   Not that I'm aware of.

14  Q.   To your knowledge, since Mr. Tawhedi's been in the United

15  States, has he possessed any weapon that wasn't placed in his

16  hands by the government?

17  A.   Inside the United States or outside?

18  Q.   Inside the United States.

19  A.   No.

20  Q.   What language did your interpreter speak at the interview?

21  A.   Dari.

22  Q.   And is your interpreter certified in any way?

23  A.   Yes.  He has to be certified by our language services

24  unit.

25  Q.   That's an internal certification?

1    A.    I believe so.

2    Q.    During the course of the investigation, I assume it's a

3    fair statement that Mr. Tawhedi was under pretty constant

4    surveillance?

5    A.    Yes, sir.

6    Q.    If the Court were to order him released, I assume

7    Department of Homeland Security and FBI would keep him under

8    surveillance; correct?

9              MR. DILLON:  Objection, Your Honor.  We don't talk

10   about techniques of surveillance.  I don't believe it's

11   relevant to this hearing.

12             THE COURT:  Mr. Hoehns?

13             MR. HOEHNS:  I'm not asking technique, Your Honor.

14   As we have combined -- asked to combine the hearings, I believe

15   this goes towards risk of flight and danger to the community.

16             THE COURT:  So you're just asking generally if he

17   would be -- continue to be surveilled --

18             MR. HOEHNS:  Yes.

19             THE COURT:  -- not in what way?

20             THE WITNESS:  It's all dependent on the resources

21   we have.

22   Q.    (BY MR. HOEHNS)  In this specific case, do you believe he

23   would be surveilled if he was released?

24   A.    Yes.

25   Q.    Quite extensively?

1    A.    Yes.

2    Q.    And that's given the nature of the charges?

3    A.    Correct.

4    Q.    When Mr. Tawhedi was arrested, did he attempt to run away?

5    A.    He did not.

6    Q.    Did he attempt to fight?

7    A.    No, sir.

8    Q.    He had just been handed a firearm by the government;

9    correct?

10   A.    That's correct, and it was in a box.

11   Q.    Okay.  He didn't attempt to get into the box?

12   A.    When he was being arrested?

13   Q.    When he was being arrested.

14   A.    No.

15   Q.    He didn't attempt to get to the firearm and pull it on

16   anybody?

17   A.    No.

18   Q.    He didn't go after anybody else's firearm?

19   A.    Not that I'm aware of.

20   Q.    He didn't resist at all, did he?

21   A.    No, sir.

22   Q.    Did he attempt to kick out any windows in the car or

23   otherwise try to escape?

24   A.    No, sir.

25   Q.    Was he anything but compliant when he was arrested?

1  *A.*   He was very compliant.

2  *Q.*   Mr. Tawhedi had a passport; correct?

3  *A.*   Yes, sir, I believe so.

4  *Q.*   And is that in the possession of the U.S. government?

5  *A.*   I'm not 100 percent sure on that, but I believe so.

6  *Q.*   Following his arrest, have any searches of his apartment

7  or his father-in-law's house been conducted?

8  *A.*   They have.

9  *Q.*   Were any weapons found there?

10 *A.*   No, sir.

11 *Q.*   Were any explosive devices or anything of that nature

12 found there?

13 *A.*   No, sir.

14         MR. HOEHNS:  May I have one moment, Your Honor?

15         THE COURT:  You may.

16         MR. HOEHNS:  I have nothing further, Your Honor.

17         THE COURT:  Thank you.

18    Any redirect?

19         MR. DILLON:  No, Your Honor.

20         THE COURT:  Thank you.  This witness is excused.

21 Thank you.

22    Does the United States have any other evidence it would

23 like to present in support of probable cause?

24         MR. DILLON:  No, Your Honor.

25         THE COURT:  Thank you.

1        Anything, Mr. Hoehns, as to preliminary hearing?

2              MR. HOEHNS:  Not as to preliminary hearing, Your

3   Honor.

4              THE COURT:  Thank you.

5        I'll hear the United States in argument.

6              MR. DILLON:  Your Honor, just as to probable cause,

7   I think that the showing has been made, it is clear that not

8   only the defendant, through the evidence in the affidavit, had

9   developed a plan with an overseas individual in which he would

10  commit an attack, he asked that person questions such as was

11  500 rounds of ammunition enough, seeking his advice and

12  direction.

13       He told FBI he believed that person to be an ISIS

14  affiliate.  There was ISIS propaganda located on his devices

15  and through his searches.

16       The acquiring of those firearms, or the attempt to acquire

17  those, along with his co-conspirator, show that that conspiracy

18  did exist.  It is clear that the FBI, through the use of their

19  source and their undercover, never entered into this plot or

20  plan.  They were outside of that.

21       Everything that was being done to further this attack was

22  not being done at the direction of FBI or a source; these were

23  the defendant's desires, as he confessed to to FBI.  It was to

24  commit an attack on behalf of ISIS.  And providing personnel,

25  the statute is clear that that can include one's own self.

1    As far as resources, the affidavit is clear that he had

2 previously sent cryptocurrency.  He attempted to obtain

3 weapons.  He also had stated in the Telegram post that he would

4 send the remainder of the money from the home sale to the

5 Mujahideen or -- and forgive me, the term is slipping me, but

6 essentially the ISIS treasury.  I think that that is more than

7 sufficient for material support, especially in light of just a

8 probable cause determination.

9    As for the second count, the evidence, quite frankly,

10 overlaps between those two, of acquiring a weapon -- or

11 attempting to acquire a weapon, knowing it to be used in a

12 terrorist -- in a violation of a terrorist act.

13          THE COURT:  Thank you.

14    Mr. Hoehns?

15          MR. HOEHNS:  I know this Court is more than capable

16 of weighing the evidence at a preliminary hearing.

17    I think it is, obviously, worth noting that Section 29 --

18 2339(b), under Subsection (h) deals with the provision for

19 personnel, specifically stating that for personnel to fall

20 under 2339(b) it has to be that the individual's acting under

21 the terrorist organization's direction or control, and that if

22 they're acting entirely independently, it doesn't fall under

23 the provision.

24    I leave it to the Court to determine whether the

25 government has met that burden.

1        As to the cash argument, Your Honor, I don't believe that

2   the criminal complaint truly lays out that Mr. Tawhedi was

3   giving -- or intending to give funds to this organization.

4        I believe the only reference to it would be at the bottom

5   of Page 17, going into Page 18.  There is no guarantee, but a

6   statement, "if we have money, we'll give it."  I don't know

7   that that rises to the level under 2339(b)'s stricture, so.

8        We, obviously, defer to the Court's determination as to

9   probable cause.  I know the Court is more than astute in

10  listening to the evidence and applying the law.

11              THE COURT:  Thank you.

12       Mr. Dillon, could you provide clarification as to

13  Subsection (h) as far as the complaint goes?

14              MR. DILLON:  Yes, Your Honor.  Actually, I don't

15  think I need to go any further than Mr. Hoehns' questions to

16  the witness.

17       He specified in his questioning that the defendant was

18  acting at the direction and control of someone else, that being

19  ISIS.  And the agent said he wasn't ordered, but he was told

20  to, in which the defendant said that he would comply with those

21  orders.

22       I -- I think it's laid out in the affidavit additionally,

23  especially just as obvious as I said, with the question of

24  seeking advice about 500 rounds of ammunition, is that enough.

25  And the reference to the money that Mr. Hoehns just provided,

 1    it does say if there is remainder, God willing, I will give it,

 2    or something to that effect.

 3        But anyway, I think that the questions alone to the agent

 4    this morning have shown that the defendant was acting at

 5    direction and control.  It doesn't -- I don't think (h)

 6    requires that you only do something that you have been told to

 7    do.  It doesn't envision that somebody can only act as a puppet

 8    or a robot.

 9        There's obviously autonomy that exists in these types of

10    conspiracies, but nonetheless, he's acting at that direction

11    and control.

12        And I would also point out that only applies to the

13    provision of providing personnel, not to providing resources.

14             THE COURT:  Thank you.

15        So with respect to probable cause, I do agree that there

16    is some significant overlap in the two charges.

17        The first is a charge of a violation of 18 U.S.C.

18    Section 2339(b), which is providing material support or

19    resources to designated foreign terrorist organizations.

20        The second statute is 18 U.S.C. Section 924(h), "Knowingly

21    receiving, conspiring to receive, and attempting to receive

22    firearms and ammunition to be used to commit a felony or a

23    federal crime of terrorism."

24        The Court has heard the testimony that has been provided

25    and also has reviewed the criminal complaint and its affidavit,

1  which the United States has requested that the Court adopt.

2  And the Court, with the one change in Paragraph 9, does adopt

3  that and recognizes and takes judicial notice of that

4  affidavit.

5      In addition to the affidavit, the testimony provided gave

6  some significant insight into the interview that took place in

7  the FBI's field office.  That was recorded, with just two

8  officers and an interpreter there.

9      During that interview, the defendant, after being fully

10  Mirandized, stated that he was in the process of purchasing --

11  or had purchased, rather, the two AK-47s.  In addition, that

12  was confirmed that he was acting upon requests or direction of

13  the ISIS representative, which was recorded on the Telegram

14  excerpts that are presented in that affidavit.  And in that

15  there is -- there are recommendations as to -- from Malik how

16  much was each going -- of the weapons going to cost.  There

17  were conversations as to the amount of bullets, as Mr. Dillon

18  has represented, would 500 be enough, is it enough, should we

19  increase it.

20      There are conversations as to donating the rest of the

21  money.  That rest of the money refers to and appears to refer

22  to the sale of the family house that was going to be taking

23  place within the -- about the 15th of October.  That money was

24  also to be used for transportation and resettling of certain

25  family members.

1    Again, those are conversations between the confirmed

2 ISIS-affiliated Malik moniker in the Telegram conversations.

3    In addition, Malik -- Mr. Tawhedi stated during that

4 interview he would obey any orders from -- from Malik, and that

5 seems to be represented as well in those excerpts of

6 conversations that are present in that affidavit.

7    There is also evidence that -- as to -- as far as money --

8 money sent to support that organization, in Paragraph 26, there

9 is -- there are a description of cryptocurrency transactions

10 that go to Syria-based organizations in a fundraising campaign

11 to benefit ISIS members and their supporters.  In addition, as

12 Mr. Hoehns pointed out, the reference as to what would happen

13 to the personal and real property values that would also be

14 sent to the equivalent of the ISIS treasury that was

15 recognized, again, in that affidavit.

16    So again, as to knowingly providing materials, support, or

17 resources to a foreign terrorist organization, the Court does

18 find that, given, again, the comprehensive nature of the

19 affidavit, that the defendant -- in the Western District of

20 Oklahoma, the defendant who has been identified during the

21 testimony today and in the criminal complaint did -- that there

22 is sufficient evidence to support a probable cause finding of a

23 violation of 2339(b).

24    And, similarly, given the situation and the circumstances

25 surrounding the arrest of Mr. Tawhedi, which took place

immediately after the -- the sale of the two AK-47s, the -- the

money that had been retrieved by Mr. Tawhedi and his

co-conspirator, that to -- to receive those two AK-47s and the

subsequent arrest thereof, and additionally and importantly,

the defendant's statements immediately following his arrest,

that that was exactly what his intent was to do, and that that

intent was to conduct an attack and -- using those weapons.

So that also supports, at least by probable cause, a

finding under 18 U.S.C. 924(h), a probable cause finding that

that -- the arrested party committed such an offense.

As such, the Court does find probable cause to bind the

defendant over to trial for each of these charges that are put

forth in the criminal complaint.

So to the extent that there is further evidence that the

United States would like to present in support of its motion

for pretrial detention, I would hear it now.

MR. DILLON:  Not in its case in chief.  We'll

address any rebuttal issues, if needed.

THE COURT:  Thank you.

I'll ask, Mr. Hoehns, if there is any evidence that you

would like to present via live testimony or proffer, or both,

as to the issue of pretrial release or detention?

MR. HOEHNS:  First, Your Honor, I would ask the

Court to take notice of the Pretrial Services Report.

THE COURT:  It will do so.

1          MR. HOEHNS:  With that, Your Honor, the bulk of the

2    proffer is just I would proffer that, having spoken with

3    Mr. Tawhedi, he's provided information consistent with that in

4    the report.  That is, he has been in the United States since

5    late 2021.

6          He has maintained employment at various oil change centers

7    and as a driver for Lyft in Dallas.  That he does not use drugs

8    or alcohol.  That he is married, his family is here.

9          He has no medical issues, no mental health issues, and at

10   this point in time has no real appreciable assets.

11         Further, we'd proffer there are no firearms located within

12   any residence which Mr. Tawhedi will ultimately be seeking to

13   be released to.

14         THE COURT:  Thank you.

15         Anything in response from the United States?

16         MR. DILLON:  No, Your Honor.

17         THE COURT:  Thank you.

18         So I'll hear the United States in argument, please.

19         MR. DILLON:  Your Honor, obviously, first, this is

20   a rebuttable presumption case; second, we do agree with the

21   recommendation of probation.

22         The weight of the evidence against this defendant is

23   great.

24         The nature of the crime itself, as at least one judge in

25   this courthouse has noted, that the suicide or death of a

1  defendant is the ultimate risk of nonappearance.  That was this

2  defendant's plan, was to murder himself during that attack.

3      While we might have stopped the immediate threat of this

4  defendant, it does not state that he would not carry through

5  with this attack.  There's been no sign that his allegiances

6  have changed, that his ideology has changed.

7      As we see, unfortunately, in the news all too often,

8  attacks can be committed in a number of ways, from weaponry,

9  explosives, down to simple things such as knife attacks,

10 vehicle attacks, things of that nature.  This defendant is

11 inherently dangerous, based on the evidence before this Court.

12      Additionally, the affidavit lays out how this defendant

13 conducted himself in his home, which was to preach the benefits

14 and -- of martyrdom to children; that the family, except for

15 his father-in-law, were aware of this plan and they were going

16 to relocate as part of this plan to Afghanistan.

17      So I don't believe there is a stability of family life

18 here.  There is not a tie to the community.  There's nothing

19 but expressed desire for the majority of this family to go back

20 to Afghanistan, and they would have been taken into ISIS

21 territory once the defendant has successfully completed this

22 attack.

23      There are no conditions that could be laid out to

24 adequately address the safety of the community and assure this

25 defendant's appearance in court.

1          THE COURT:  Mr. Hoehns, when you're ready.

2          MR. HOEHNS:  Your Honor, I acknowledge that this is

3     a rebuttable presumption case.  However, from the proffers made

4     to the Court, the Pretrial Services Report, and the testimony

5     from the stand today, that presumption has been rebutted,

6     thereby putting the burden on the government.

7          Quite simply, Your Honor, this might be a charge that the

8     government doesn't like, that the public doesn't like, but it

9     doesn't change the burden of proof under the Bail Reform Act.

10          And as I review the Pretrial Services Report, the evidence

11     in the form of the criminal complaint, and the testimony, there

12     are conditions that can be imposed that would minimize risk of

13     flight or nonappearance and ensure safety to the community.

14          It's noteworthy that Mr. Tawhedi has never had so much as

15     a traffic infraction in three years.

16          Law enforcement searched his house; they found no weapons

17     or firearms.  They searched his relative's house; they found no

18     firearms or weapons.

19          It appears the only time Mr. Tawhedi's ever possessed a

20     firearm is when a government agent or confidential source has

21     literally placed the weapon in his hand.

22          We have no prior allegations of violence, no allegations

23     of drug use, no allegations of alcohol use.

24          As I look at the Pretrial Services Report and the PTRA

25     score, and associated risk, these are some of the lowest

numbers I have seen, handling a number of federal cases.  The
statistics put the risk of failure to appear at three percent,
a new criminal arrest at three percent, and technical violation
revocation at four percent, for a total failure rate of ten
percent.  That's obviously well below the 50 percent required
for -- for flight, and it certainly doesn't rise to the level
of clear and convincing evidence, which we all know is
significantly higher than preponderance of the evidence.

Mr. Tawhedi has no real resources at this point in time.
He has no passport to flee.

He does have a home to go to.  And this Court can impose
conditions, including home detention with GPS monitoring.  The
Court can impose a travel restriction.

And I would note, for a home detention, a -- the Court can
impose home detention but for visits at attorney offices,
medical visits that are pre-approved, and visits from U.S.
probation.

The Court can impose restrictions on internet access,
including a restriction on the type of phone Mr. Tawhedi can
possess.

If the government's concerned about Mr. Tawhedi receiving
orders from other individuals, that can be addressed under
conditions of supervision.

It's noteworthy the testimony we had here today.  If the
Court's to release Mr. Tawhedi, he will not only be supervised

1  by U.S. probation, I can pretty well guarantee the Court that

2  there will be somebody, if not multiple individuals from

3  Homeland Security and FBI, down the street or in the parking

4  lot watching him at all times.

5        The public can be protected here.  The risk of safety to

6  the community can be protected.  Risk of flight or

7  nonappearance can be ensured with conditions of release here.

8        The government had mentioned parole status.  This Court is

9  more than aware of the *Ailon-Ailon* case.  If the Court orders

10  Mr. Tawhedi released on conditions and the government chooses

11  to deport or remove him from this country, that's their choice.

12  It's all the Department of Justice.  It's all one umbrella.

13  That's a decision for them.

14        The reality, though, is, when we look at the specific

15  characteristics of Mr. Tawhedi, they warrant release in this

16  case.  The Bail Reform Act certainly could have listed a number

17  of offenses as no release ever, but Congress chose not to do

18  that.

19        They could have put in Section 3142 or 3143, if the Court

20  finds probable cause or if there is an indictment on 2339(a),

21  2339(b) or 924(h) offenses, the defendant shall be detained,

22  but they chose not to do that because they realize that

23  individuals with these charges can still be released into the

24  community and be released safely and with a minimal risk of

25  nonappearance.

1    We ask the Court to follow the strictures of the Bail

2    Reform Act, impose the least restrictive set of conditions,

3    which in this matter would be home detention; a travel

4    restriction; not to attempt to obtain another passport;

5    limitation, that is, no internet access; and phone restriction

6    to only dumb, that is, non-internet-access devices for his

7    phone.

8         Thank you, Your Honor.

9              THE COURT:  Thank you, Mr. Hoehns.

10    The United States has the last word, if it would like it.

11              MR. DILLON:  Just briefly, Your Honor.

12         As the Tenth Circuit has noted, that somebody's status or

13    lack of status in the United States cannot be a sole factor in

14    detention, but it doesn't mean it can't be a factor in

15    detention.

16         Additionally, this idea that if we surround the defendant

17    with a bubble of law enforcement 24/7, that hopefully nothing

18    would go wrong, that argument could be made in any detention

19    hearing.  But, quite frankly, I think that's beyond the power

20    of the Court to order the executive branch and members of FBI

21    or Homeland Security to monitor somebody 24/7 and have that

22    presence.

23         It is unfortunate, other things happen and resources have

24    to be redirected and dedicated to new investigations and new

25    threats that bring -- that come about in the course of their

1  job.  We don't know what could happen, what would happen, and

2  the practicality of that 24/7 monitoring through the conclusion

3  of a trial.

4          THE COURT:  Thank you.  And the Court will take a

5  brief recess before issuing its decision.

6      (Break taken.)

7          THE COURT:  So to start, the Court would note that

8  any findings that it does make during this hearing only go to

9  whether or not the defendant is released or detained pending

10 trial.  They have -- any findings the Court does make has no

11 bearing upon the defendant's presumption of innocence as to the

12 underlying charges.

13     So the Court heard some, and -- some evidence was

14 presented about what is called a rebuttable presumption.  And

15 under the Bail Reform Act, a rebuttable presumption that the

16 Court can come up with no set of circumstances that would

17 reasonably assure the safety of the community and reasonably

18 assure the defendant's appearance in Court does arise given the

19 nature of the charge that did involve -- or that one of the

20 charges that is an alleged violation of 18 U.S.C.

21 Section 2339(b).

22     However, to overcome that rebuttable presumption, the

23 defense must put forth some evidence, as is set forth in the

24 case law.  And given the Pretrial Services Report, which the

25 Court does take note of, and the evidence proffered by counsel,

the defendant does have no criminal history.  As noted, nothing
so much as a traffic stop since his entrance into the United
States in 2021.  And there were no weapons found on the
defendant, apart from those involved allegedly in the
transaction, and none in the defendant's home or the home of
his relatives.

So for purposes of the rebuttable presumption, the Court
does find that the rebuttable presumption has been overcome.
However, that presumption still remains a factor that the Court
considers as it makes its decision.

So moving on then to the factors the Court must consider,
those factors begin with the nature and circumstances of the
offense charged.  The nature and seriousness of the offense
charged is one that is extremely concerning as it both
encompasses a risk of danger to the community, and as put forth
by the United States, and that involved martyrdom, also poses a
risk of nonappearance.

The defendant's charge alleges that the defendant
orchestrated the sale of personal and family items in order to
purchase firearms and ammunition for the purposes of committing
a violent and deadly attack on Election Day in the United
States.

It is alleged that the defendant's Google account
possessed numerous ISIS propaganda images and photos of the
defendant displaying gestures in the same manners that ISIS

1    militants pose.

2         Additionally, there was evidence put forward that the

3    defendant and several members of his family all pledged to

4    ISIS.

5         The defendant also admitted to law enforcement, following

6    his arrest, that he expected to be martyred, which is a person

7    who would voluntarily suffer death because of their beliefs,

8    and he would be martyred following an attack on Election Day,

9    targeting large gatherings of people.

10        So the nature and circumstances of the offense charged

11   certainly weigh in favor of detention.

12        As to the weight of the evidence against the person, the

13   Court has found at least probable cause to support the charges,

14   again, as found at the preliminary hearing.

15        However, the Court would note that the evidence might be

16   greater for purposes of this hearing only, given the statements

17   that the defendant did make immediately following his arrest,

18   and given the testimony provided here today and those set forth

19   in the affidavit.

20        As to the person's character, physical and mental

21   condition, family ties, employment, the defendant is here -- he

22   is a 27-year-old male who has been charged with providing,

23   attempting to provide, and conspiracy to provide materials,

24   support and resources to a designated foreign terrorist

25   organization.  And he's been charged also with knowingly

receiving, conspiring to receive, and attempting to receive firearms and ammunition to be used to commit a felony or a federal crime of terrorism.

He is a citizen of Afghanistan. He was in the process of obtaining his permanent residency.

His wife had reported that he had worked as a security guard at the U.S. Eagle Military Base while in Kabul, Afghanistan.

He came to the United States in September of 2021.

He has resided in Oklahoma since December of 2023.

He has maintained employment as a mechanic at various different places, or changing oil. He also has had employment as a Lyft driver or Uber driver, or similar services such as that.

He has family here in the United States. However, as put -- as set forth in the affidavit, there is evidence that the majority of that family was to be relocated to Kabul preceding the planned attack. The only person who was not going to be was the person that all parties seem to agree had no knowledge as to what was going on, that was his -- was the co-conspirator's father-in-law -- rather, the defendant's father-in-law.

But -- so the resettling of that family certainly does not suggest significant family ties here, although at present his wife does have an apartment in which he could return with his

1    young child.

2        There was conflicting information as to the defendant's

3    employment as to the -- at the time of the arrest, but he had

4    been recently working as a mechanic in the past few months.

5        There is no known assets that the defendant has in the

6    United States at this point, or in any other country.

7        The defendant does not appear to have any physical health

8    concerns, no mental health concerns, no substance abuse

9    history, as Mr. Hoehns pointed out.

10       And again, there has been -- the case agent has reported

11   that the defendant has pledged his allegiance to ISIS.

12       There is no criminal history, again, of the defendant

13   within the United States, so the defendant was not -- which is

14   another factor that the Court looks at -- the defendant was not

15   on any sort of probation or parole as to criminal history,

16   apart from immigration status.

17       And the last factor that the Court considers is the nature

18   and seriousness of the danger to any person or the community

19   that would be posed by the person's release.  And once again,

20   given the nature and circumstances of the offense charged and

21   -- the Court does have serious concerns as to the seriousness

22   of the danger that could be posed to any person or the

23   community by the defendant's release.

24       The Court did consider the arguments, the able arguments

25   presented by defense counsel as to restrictions on internet, on

various other services, on various types of monitoring and GPS and home detention, home incarceration.

However, given the facts that have been put forth and the Court has found credible given the testimony provided today, the Court does not believe that it could come up with any set of circumstances -- balancing these factors as it must under the Bail Reform Act, that it could not come up with any sort of circumstances that would reasonably assure the defendant's appearance in Court given, again, as the United States argued, the pledge of potentially being martyred during this attack or acting on other behalf to endanger other people.

The Court's concerned about the defendant's likely appearance in court because he had pledged the potential of voluntarily suffering death because of his beliefs and the actions he would take.

And also, the Court finds that the United States has shown by clear and convincing evidence that the release of the defendant would pose a danger to the community that the Court could not mitigate sufficiently with any set of circumstances it could put forward.

So as such, the Court will order that the defendant be remanded to the custody of the United States marshals pending further proceedings in this matter.

Is there anything further from the United States?

MR. DILLON:  No, Your Honor.

1          THE COURT:  Anything further, Mr. Hoehns?

2          MR. HOEHNS:  No, Your Honor.

3          THE COURT:  Before I excuse -- I will just make one

4   further note.

5       As to the ICE detainer, that is a factor that the Court

6   can consider, as has been pointed out, and the Court did

7   consider that, but it was not determinative in its final

8   conclusions.

9       That being said, we are adjourned and the parties are

10  excused.

11      (Court adjourned.)

12                    REPORTER'S CERTIFICATION

13          I, Emily Cripe, Federal Official Court Reporter,

14  in and for the United States District Court for the Western

15  District of Oklahoma, do hereby certify that pursuant to

16  Section 753, Title 28, United States Code that the foregoing is

17  a true and correct transcript of the stenographically reported

18  proceedings held in the above-entitled matter and that the

19  transcript page format is in conformance with the regulations

20  of the Judicial Conference of the United States.

21                    Dated this 21st day of October, 2024.

22

23                    **/S/ Emily Cripe**
                      EMILY CRIPE, CSR
24                    Federal Official Court Reporter

25